**BOEHRINGER INGELHEIM VETMEDICA, INC., et al., Plaintiffs,**

**v.**

**SCHERING–PLOUGH CORPORATION and Schering Corporation, Defendants.**

No. CIV. 96–4047(HAA).

United States District Court, D. New Jersey.

June 20, 2000.

Jennifer Gordon, Jonathan A. Marshall, Scott D. Stimpson, Pennie & Edmonds, New York City, for Plaintiffs.

Sidney David, Paul H. Konchanski, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Defendants.

## OPINION

ACKERMAN, Senior District Judge.

This matter comes before the Court on Schering's defense of inequitable conduct in the above-referenced case. This Court severed the defense of inequitable conduct from Boehringer's claim of infringement and Schering's defense of obviousness. On January 20, 2000 a jury found the Boehringer had proven infringement by a preponderance of the evidence and that Schering had failed to demonstrate that the 5,476,778 Patent (hereinafter "the '778 Patent") was obvious. Thereafter, this Court held a two-day hearing on the issue at hand, i.e., whether Boehringer engaged in inequitable conduct before the United States Patent Office (hereinafter "USPO").

After carefully consideration, for the reasons stated below, this Court finds that Schering has failed to prove that Boehringer engaged in inequitable conduct that would invalidate the '778 Patent. Accordingly, since all substantive issues have now been resolved in this matter, together with an Order issued on this same date, final judgment shall be entered in this matter in favor of Boehringer.[1]

## I. DISCUSSION

This is not the Court's first opinion on the issue of inequitable conduct and the

---

1. This Court also rejects Schering's oral motion for judgment notwithstanding the verdict. The Court is aware that Schering intends to move for a new trial pursuant to Fed.R.Civ.P. 50(b). This Court will consider that motion at the appropriate time.

standards that apply thereto. *See Boehringer Ingelheim v. Schering–Plough*, 984 F.Supp. 239 (D.N.J.1997) (hereinafter *"Boehringer I"*); *Boehringer Ingelheim v. Schering–Plough*, 6 F.Supp.2d 324 (D.N.J. 1998) (hereinafter *"Boehringer II"*) and *Boehringer Ingelheim v. Schering–Plough*, 68 F.Supp.2d 508, 536 (D.N.J.1999) (hereinafter *"Boehringer III"*). Therefore, this Court will not engage in a lengthy recitation of the relevant case law but instead will focus on the law which is most relevant to this inquiry. In addition, familiarity with the subject matter at issue is assumed.

 Inequitable conduct means any "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Refac International, Ltd. v. Lotus Development Corp.*, 81 F.3d 1576, 1581 (Fed.Cir. 1996) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995)). The party alleging "inequitable conduct" must prove by clear and convincing evidence a threshold level of both the materiality of the withheld or misrepresented information as well as the opposing party's intent to deceive. *Id.* This high burden of proof is required because each duly issued patents enjoy a presumption of validity. "Clear and convincing" evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable. *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed.Cir. 1988) (*citing Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)).

 Once a threshold level of materiality and intent is established, the Court must balance these findings to determine whether the equities of the case warrant a finding of inequitable conduct. *Molins*, 48 F.3d at 1178. In balancing the materiality of the undisclosed or misrepresented information and the applicant's intent to deceive the USPO, the Court must consider all of the evidence, including evidence of the applicant's good faith. *Id.*, 48 F.3d at 1181; *Kingsdown Medical Consultants Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988); Schering's Post–Trial Br. at p. 12. Because this Court's inquiry must consider materiality and intent together, "the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct." *Akzo N.V. v. United States International Trade Commission*, 808 F.2d 1471, 1481–82 (Fed.Cir.1986). This ultimate determination is entrusted to the Court's discretion. *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1439–1440 (Fed.Cir.1991).

The materiality of a reference for purposes of an inequitable conduct defense is tested by the standard enunciated in 37 CFR § 1.56. Prior to amendment in 1992, information was deemed material if there was a "substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Refac*, 81 F.3d at 1581; 37 C.F.R. § 1.56 (1984). In 1992, however, this standard was amended to provide that "information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes . . ." 37 C.F.R. § 1.56 (1992). The post–1992 standard further provides that a "prima facie case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability." *Id.* Although Schering suggests that the pre-amendment standard applies to this

case, Schering argues in its brief that it has proven the materiality of the relevant references under both the pre- and post–1992 standards. *See e.g.*, Schering's Post–Trial Br. at p. 5 (the "change [in the standard] is unimportant in the present case because there are a number of reasons why the Collins and Benfield homogenate would clearly have been material under Rule 56 before and after the 1992 change"). For purposes of this Opinion, this Court will apply both the pre–1992 and post–1992 standard for materiality.

■ It is axiomatic in patent law that a patentee has no duty to disclose material prior art which is merely cumulative of (or less material than) other art submitted to the USPO. *See Halliburton*, 925 F.2d at 1440; *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1328 (Fed.Cir.1998). Thus, a defense of inequitable conduct will fail if it is based on the non-disclosure of prior art which was merely cumulative of other art disclosed to the USPO.

■ "Intent" for purposes of an inequitable conduct defense means "design, resolve, or determination with which a person acts; a state of mind in which a person seeks to accomplish a given result through a course of action." *Molins*, 48 F.3d at 1180. Intent "need not be proven by direct evidence" and is "most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor." *Id.* An intent to deceive is "found when in light of all the evidence, the conduct indicates 'sufficient culpability to require a finding of intent to deceive.'" *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1183 (Fed.Cir.1993).

■ Proof of inequitable conduct based upon the non-disclosure of prior art may

be rebutted by showing: (1) that the disputed reference was not material; (2) that if the reference was material, the applicant did not know of its existence or that the reference was "merely cumulative" of another reference already disclosed; (3) if the applicant knew of the contested reference, the applicant did not know of its materiality; or (4) that the applicant did not intend to mislead the PTO by failing to disclose it. *Elk Corp. v. GAF Building Materials Corp.*, 168 F.3d 28, 30–31 (Fed. Cir.1999).

Here, Schering argues that Boehringer failed to disclose and intentionally misrepresented the following information to the USPO: (a) the origins of the work completed by Drs. Collins and Benfield and (b) the existence of Drs. Dea and Van Alstine's work and its relevance to the '778 Patent application. Each of these arguments will be discussed in turn.

### A. Drs. Collins and Benfield's Work

■ Schering argues that Boehringer intentionally included Drs. Collins and Benfield's homogenate work in the section entitled "The Invention" rather than citing that work as prior art in an effort to deceive the USPO of the true state of the prior art at the time of Boehringer's invention. I disagree and find that Schering has failed to prove by clear and convincing evidence that this information was material and that Boehringer included this work in "The Invention" section of the '778 Patent to deceive the USPO.

### 1. Materiality of the Drs. Collins and Benfield Homogenate Work

The first inquiry this Court undertakes is to determine whether Boehringer made a material misrepresentation to the USPO regarding the Collins and Benfield work.[2]

2. Before reaching the materiality of the alleged misrepresentation, the Court notes that Boehringer argues indirectly that the inclusion of Drs. Collins and Benfield's work under the heading "The Invention" is not a misrepresentation. Schering argues that the

inclusion of this work under that heading clearly misrepresented the fact that the homogenate work was not performed by Boehringer, was not part of the invention and in fact, was performed before the date of Boehringer's invention. In response, Boehringer ar-

As stated above, where a party alleges inequitable conduct from an affirmative misrepresentation of information, the party must prove by clear and convincing evidence (1) the information submitted was material and false and (2) the information was submitted with an intent to deceive. *J.P. Stevens & Co., Inc. v. Lex Tex Inc.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). Materiality in this case will be measured by both the standard in place at the time Boehringer initially filed its application for the '778 Patent as well as the standard enacted in 1992 while the '778 Patent was still pending before the USPO. Under either standard, this Court concludes that Schering has not met its burden of proving a threshold level of materiality with respect to the Drs. Collins and Benfield work.

Since Schering contends that Boehringer misrepresented the Collins and Benfield work in the '778 Patent application by including this work under the heading "The Invention," it is helpful to review exactly how the homogenate work was included in "The Invention" section of the '778 Patent application. That section provided:

> A tissue homogenate obtained from piglets in SIRS-infected herds consistently reproduced the respiratory and reproductive forms of SIRS when intransally inoculated in gnotobiotic piglets and pregnant sows. Gnotobiotic piglets so inoculated with either unfiltered or filtered (0.45, 0.22, or 0.1 μm) inoculum became anorectic and developed microscopic lung lesions similar to lesions seen in SIRS-affected herds. The same inoculum also caused reproductive effects identical to those seen in SIRS-

infected herds. A viral agent has been recovered from the tissue homogenate. . . .

PTX 1. It is undisputed that the work described from the beginning of the above-cited paragraph through to the sentence "The same inoculum also caused reproductive effects identical to those seen in SIRS-infected herds" is truly the work of Drs. Collins and Benfield and was not part of the invention.

Schering argues that "[I]f the Examiner had known that the prior art already included the Collins and Benfield homogenate and filtering work which established that the agent was a *virus* (as opposed to a mycotoxin or chlamydia, for example), the only question the Examiner would have had to ask and answer was whether one skilled in the art would have been motivated to take the MSD [mystery swine disease] virus already identified as contained in the Collins and Benfield homogenate and inoculate it on simian lines, known to be very permissive, with a reasonable expectation of success." Schering's Post–Trial Br. at p. 7 (internal citation omitted); *see also Id.* at pp. 7–8.

Boehringer argues that the homogenate work is not material because (a) it is cumulative to the Wensvoort Reference which disclosed that Porcine Reproductive Respiratory Syndrome (hereinafter "PRRS") was a virus and that PRRS had been isolated on porcine macrophage and (b) it would not have been important to the USPO's obviousness determination because it did not motivate one skilled in the art to grow PRRS on simian cells. Boehringer further argues that the immateriality of the homogenate work is illustrated by the fact that USPO examiners considered the Drs. Collins and Benfield work and

---

gues that the inclusion of this information under the heading "The Invention" did not misrepresent the scope of the invention because it is uncontested that the scope of an invention is determined by the claims of the patent and not the specification of the patent. This Court need not reach this issue because, as discussed in further detail below, Schering

has not proven that the alleged misrepresentation was material or made with the intent to defraud the USPO. For ease of discussion, this Court has assumed that Boehringer made a misrepresentation. This assumption, however, should not be considered a judicial determination that Boehringer did, in fact, misrepresent the scope of the invention.

issued the 5,840,563 Patent (hereinafter "the '563 Patent"), a patent which is broader in scope than the current '778 Patent. After considering the parties' respective positions as well as the evidence received by the Court to date, this Court finds that Schering has failed to prove a threshold level of materiality by clear and convincing evidence.

### a. The USPO knew that PRRS was a virus

First, Schering argues that Boehringer's misrepresentation was material because it kept the examiners ignorant of the fact that the prior art disclosed that PRRS was a virus. Putting aside the questions of whether or not it was important for the examiners to know that PRRS was a virus to evaluate the obviousness of the '778 Patent and whether Collins and Benfield's work would have informed the USPO of this, Schering has failed to prove the materiality of this misrepresentation because Boehringer did inform the USPO that PRRS was a virus. In the prosecution of the '778 Patent, Boehringer disclosed to the USPO the article entitled "Mystery swine disease in the Netherlands: the isolation of Lelystad virus" by Dr. Wensvoort, et al. which was published in the July 1991 edition of The Veterinary Quarterly. *See* PTX 7 (hereinafter "Wensvoort," "Wensvoort reference" or "Wensvoort article"). The Wensvoort article disclosed that an unknown virus was the likely cause of PRRS. Indeed, the Wensvoort reference disclosed that:

> The mycoplasmas M. hyosynoviate, M. hyopneumoniae, and Acholeplasma laidlawii, and the viruses encephalomyocarditis virus and porcine enterovirus types 2 and 7 were isolated from individual pigs. **An unknown agent, however, was characterized as a virus and designated Lelystad virus.... Of 165 sows reportedly afflicted with the disease, 123 (75 per cent) seroconverted to Lelystad virus, whereas less than 10 per cent seroconverted to any of the other virus isolates or to the known viral pathogens.** Antibodies directed against Lelystad virus were also found in pigs with mystery swine disease in England, Germany and in the United States. **We conclude that infection with Lelystad virus is the likely cause of mystery swine disease.**

PX7 at B 067199 (emphasis added). Therefore, the examiners of the '778 Patent had an article before them for consideration which concluded that a virus was responsible for mystery swine disease.

As stated above, a reference cannot be material if it is merely cumulative of the references before the USPO. Thus, assuming *arguendo* that Collins and Benfield work disclosed that PRRS was a virus, Schering has failed to prove that that reference was material in light of the evidence that it would have been cumulative of the Wensvoort reference which was disclosed to the USPO. Accordingly, since the identification of PRRS as a virus was before the USPO, Schering has failed to prove that Boehringer kept the USPO ignorant of that fact.[3] Thus, in this respect Schering has failed to prove that including the Collins and Benfield work under the heading "The Invention," was a material misrepresentation.

### b. Collins and Benfield's Teachings

Even if Boehringer's disclosure left the USPO ignorant of the fact that the prior art disclosed that PRRS was a virus, this Court rejects the second prong of Schering's materiality argument, *i.e.*, that disclo-

---

**3.** The Court understands that the Wensvoort article is not prior art because it was published in July 1991, several months after the date of Boehringer's April 1991 invention. However, it appears that the USPO relied on this article as prior art, *see* PTX 4 at B064481 and B064483. Accordingly, because the Wensv-

oort reference disclosed that PRRS was a virus and because the USPO considered the Wensvoort reference to be prior art, Schering's argument that the USPO was under a misimpression that the prior art did not disclose that PRRS was a virus is unpersuasive.

sure of the Collins and Benfield homogenate work would have disclosed that PRRS was a virus and that this disclosure would have been important to the USPO's obviousness determination. Schering argues that Drs. Collins and Benfield's work was material because it showed that PRRS was a virus and that would have fixed a different starting-off point for the invention than what was otherwise disclosed to the USPO. Schering's position rests on the argument that because the homogenate was filtered at 0.1 $\mu$m, one would know that the causative agent was a virus and from that knowledge one would proceed just as Boehringer had in April 1991. This Court rejects Schering's inequitable conduct defense because Schering has failed to prove (a) that the homogenate work conclusively showed that PRRS was a virus, (b) that even if the homogenate work would have shown this, that this would have been material to the USPO's consideration of the '778 Patent.

First, Schering has not proven to this Court that the homogenate work conclusively revealed that PRRS was a virus, at the time of the patent prosecution. Dr. Easterday, an expert in veterinary virology, testified that one would not necessarily know that PRRS was a virus from the fact that it had been filtered at 0.1 $\mu$m. Tr. at 16.119. Dr. Collins, who was directly involved with the homogenate work, even testified that his work on the PRRS homogenate did not conclusively show that PRRS was a virus. Tr. at 3.37. Dr. Collins said that at the time he was involved in the homogenate work, he hypothesized that PRRS might be a virus but he never proved that PRRS was a virus or not a virus. Tr. at 3.65. He explained that he "hadn't concluded that it was a virus, because it could have been something new, never discovered before that passed through or a toxin or whatever. We were working on a hypothesis that possibly or probably was a virus, but we wanted to keep our minds open to toxins or new discoveries or whatever that were small and could pass through a filter of that

size." Tr. at 3.117. Dr. Harris, Boehringer's scientist and co-inventor of the '778 Patent who received the homogenate from Dr. Collins, testified that when he received the homogenate he was sure that it contained the causative agent for PRRS but that he did not know conclusively that the causative agent was a virus. Tr. at 4.107–108. Although Schering offered evidence to the contrary, this Court credits the testimony of Boehringer's witnesses and finds that Schering has not proven that disclosure of the Collins an Benfield homogenate work as prior art would have informed the USPO that PRRS was a virus.

Second, as this Court has held in the past, even assuming that the homogenate work revealed that a virus was the cause of PRRS, Schering has not proven that that discovery was not material to the USPO's obviousness determination. To be important to the USPO's obviousness decision the prior art must have been important to showing that one of ordinary skill would have a reasonable expectation of success growing PRRS on simian cells. Schering has failed to convince this Court that mere knowledge that PRRS was a virus would have been important in determining the obviousness of the '778 Patent.

This Court credits Boehringer's experts who testified that even if the USPO knew that PRRS was a virus, this would not have been important under 35 U.S.C. § 103 because the state of the art at the time did not teach the growth of an unknown porcine virus on simian cells. Dr. Easterday opined that the Collins homogenate was not relevant to the '778 Patent at all because it did not disclose anything about the use of MA–104 cells (or simian cells) or other methods of culturing PRRS. 16.76–77. Dr. Easterday testified further that the Collins and Benfield homogenate work did not teach anything about how to isolate this unknown entity. Tr. at 16.78. Dr. Easterday also opined that there was nothing in the Dea, Van Alstine and Collins works that would have made the '778

Patent obvious. Tr. at 16.78. While this opinion speaks to the conclusion the USPO would make rather than whether these references would be material to the USPO's obviousness consideration, Dr. Easterday's testimony is very informative.

This testimony is supported by the failure of others to isolate and grow PRRS on simian cells or even attempt to isolate PRRS on simian cells. For example, Dr. Collins' team failed to isolate PRRS. This is very telling given that Dr. Collins' team worked with the homogenate, hypothesized that PRRS was a virus, and had scientists who exceeded the level of ordinary skill in the art. Dr. Collins supervised the isolation attempts of two Ph.D. virologists in his laboratory and another scientist, D. McCullough, who was visiting South Dakota Statute University. Tr. at 3.37. These scientists tried without success to grow PRRS. Their attempts were not fleeting. Dr. McCullough worked nearly full-time attempting to isolate the causative agent. Tr. at 3.42. Dr. Benfield's personal failure to isolate PRRS is also probative of this issue. Dr. Benfield, an experienced scientist, who had access to both the homogenate and Boehringer's list of available cells which included simian cells did not have any success growing PRRS. Nor did Dr. Benfield even attempt to grow PRRS on simian cells. Tr. at 3.46.

In addition to the failure of Dr. Collins's team, Dr. Collins's testimony about the state of the art in 1990 and 1991 is also helpful in this regard. Dr. Collins testified that when he reviewed the list of cells available to him through Boehringer, he concluded that "there was nothing particularly unusual or enlightening to me from this list," despite the fact that simian cells were on the list of available cells. Tr. at

3.46. Dr. Collins testified further that when he learned that Dr. Harris had success growing PRRS on simian cells, he was surprised. Tr. at 3.48–3.49.

The work of Dr. Collins's team and Dr. Collins's credible testimony in this case weighs heavily on this Court's conclusion that even if Schering were right that Dr. Collins's work conclusively determined that PRRS was a virus, that knowledge would not have been material to the obviousness determination because there was nothing about this knowledge that would have shed light on whether the art taught one to isolate PRRS on simian cells. Moreover, although Mr. Chladek, one of the inventors of the '778 Patent, testified that it would have been helpful to know that PRRS was a virus before trying to isolate it, he did not testify that such knowledge would have taught him to use simian cells or would have been material to the obviousness decision.[4]

Thus, under the post–1992 standard of materiality, Schering has not proven that a prima facie case of obviousness would have been compelled based upon the homogenate work even giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability. In addition, Schering has not proven that the homogenate work would have been important to a reasonable examiner under the pre–1992 standard of materiality.

### c. Other Evidence of Immateriality

This Court's conclusion that Schering has not proven a threshold level of materiality with respect to the homogenate work

---

4. In addition, Schering has also failed to prove that the homogenate work shows all of the elements of the '778 Patent (alone or in combination with the other prior art at the time of the invention) such that it could be material to the USPO's consideration of the '778 Patent under 35 U.S.C. § 103. The homogenate work teaches nothing about how to isolate PRRS, whether to grow it in the presence of serum or at what temperature one would grow PRRS. Tr. at 21.15–21.17. Even in combination with the other art available at the time, the homogenate work did not teach the limitations of Claim 1 of the '778 Patent.

is supported by the USPO's treatment of the '778 Patent in light of the Boehringer's disclosure of the Wensvoort reference. The fact that the USPO did not reject as obvious the '778 Patent after considering the Wensvoort reference supports this Court's independent conclusion that the knowledge that the prior art disclosed that PRRS was a virus would not have been material to a reasonable examiner considering the '778 Patent.[5] As discussed above, the Wensvoort reference disclosed that PRRS was likely caused by a virus rather than other causative agents. After considering the Wensvoort reference, the USPO neither rejected nor questioned the '778 patent under 35 U.S.C. § 103. If the USPO considered it important or material to the '778 Patent that PRRS was a virus, the USPO could have rejected the '778 Patent as obvious based upon the Wensvoort reference (which the USPO treated as prior art). Thus, the fact that the USPO did not reject the '778 Patent as obvious based upon the Wensvoort reference supports this Court's conclusion that Schering has failed to prove the materiality of the Drs. Collins and Benfield work.

Moreover, this Court's conclusion that Schering has not proven the materiality of the homogenate work is buttressed further by the fact that the homogenate work was disclosed to the USPO in connection with the related '563 Patent and the USPO neither rejected the '563 Patent as obvious nor questioned Boehringer in light of the homogenate work. In this case, Boehringer's '563 Patent and the '778 Patent were both pending before the USPO at the same time. It is uncontested that the '563 Patent is broader than the '778 Patent but "not patentably distinct" from the '778 Patent. Tr. at 20:99. In connection with the related '563 Patent application, Boehringer disclosed to the Patent Office an abstract by Drs. Collins and Benfield. *See* PTX 89. That abstract originated from a presentation made by Drs. Collins, Benfield, Goyal and Shaw at a Conference of Research Workers and Animal Diseases in November of 1990. Tr. at 16.76. That abstract disclosed that:

> "Piglets inoculated with filtered (0.45 Sm or 0.22 μm) or unfiltered tissue homogenates became anorectic, lethargic, huddled, rubbed their snouts vigorously on the walls of the isolators, and developed rough hair coats by 4 days post-inoculation (PI) ... Sera collected at necropsy did not contain antibodies to Leptospira bratislava, Eperthrozoon suis, pseudorabies, encephalomyocarditis, haemagglutinating encephalomyelitis, swine influenza, and transmissible gastroenteritits viruses."

PTX 89 at B10531.

The record demonstrates that Examiner Preston reviewed this abstract in 1992. After reviewing this abstract, however, the USPO did not reject the '563 Patent as obvious. Thus, the USPO's conduct after considering the Collins abstract in connection with the broader '563 Patent further

---

5. In drawing this conclusion, this Court is keenly aware that the standard for rejecting a patent is different than the standard of materiality. The Federal Circuit has provided the following guidance in this respect:

> We have held that the result of a PTO proceeding that assesses patentability in light of information not originally disclosed can be of strong probative value in determining whether the undisclosed information was material. However, the standard to be applied in determining whether a reference is "material" is not whether the particular examiner of the application at issue considered the reference to be important; rather, it is that of a "reasonable examiner." Nor is a reference immaterial simply because the claims are eventually deemed by an examiner to be patentable thereover. Thus, the fact that the examiner did not rely on [a reference] to reject the claims under reexamination or [in the related] '410 method claims is not conclusive concerning whether the reference was material.

*Molins,* 48 F.3d at 1179–1180 (internal citations omitted). Thus, while the USPO's actions are not conclusive on the issue of materiality, it is instructive to this Court's analysis that the USPO did not reject or question the '778 or '563 Patents over the Wensvoort reference and the Collins abstract.

supports this Court's conclusion that Schering has not proven that the Collins work would either compel a conclusion of obviousness or would have even been important to a reasonable examiner in deciding whether to allow the application to issue as a patent.

Evidence of the USPO's reaction to the homogenate work is particularly instructive in this case because the same examiners who considered the '778 Patent also considered the '563 Patent application. There is evidence that on August 12, 1992, Examiner Preston, who was considering the '778 Patent and '563 Patent both (a) indicated that he read the Collins abstract in connection with the '563 Patent and (b) searched for prior art in connection with the '778 Patent. Tr. 21.131:5–10. Also, Examiner Caputo, who ultimately permitted the '778 Patent also reviewed the Collins abstract during the pendency of the '778 Patent. Tr. 21.133:3–14; 21.134. The evidence that at least one examiner who considered the Collins abstract considered contemporaneously prior art in the '778 Patent prosecution heavily supports this Court's conclusion that the homogenate work would not have been important to a reasonable examiner or would "compel a conclusion" of obviousness under 37 C.F.R. § 1.56.[6] The evidence that a second examiner, Examiner Caputo who ultimately allowed the '778 Patent, also reviewed the Collins abstract during the pendency of the '778 Patent is also probative of the materiality of the Collins and Benfield homogenate work and supports this Court's conclusion.

Thus, this Court finds that Schering has failed to prove that Boehringer's inclusion of the Drs. Benfield and Collins work under the heading "The Invention" was a material misrepresentation or that Boehringer's failure to rely upon the Collins and Benfield in the '778 Patent prosecution was a material omission.

#### d. Schering's Other Arguments

Schering points to Ms. Devlin's testimony to support its argument that the homogenate work was material and that Boehringer knew of this materiality. Ms. Devlin testified at her deposition that she did not cite this work as prior art because she did not want to risk jeopardizing the patent filed by the University of Minnesota. Schering's Post–Trial Br. at pp. 8–9. The fact that Ms. Devlin did not characterize this work as prior art because of her fears about another patent application does not require a conclusion by this Court that the Collins and Benfield work was in fact "material" to the '778 Patent. Indeed, Ms. Devlin did not testify that she had concluded that the homogenate work was "material," rather she stated that she did not disclose this as prior art in the '778 prosecution because doing so "might jeopardize the patent filings by Minnesota, ..." Tr. 20.29:9–10 and because she did not have the prior art in front of her, she was "not going to characterize it any more than I had to." Tr. 20.29:16–19. This testimony, in light of the other evidence before the Court, does not establish a threshold level of materiality.

In addition, Schering errs in its argument that Boehringer cannot excuse its misconduct in the '778 Patent process by referring to disclosures it made in connection with the '563 Patent because the Manual of Patent Examining Procedure (hereinafter "MPEP") states that "[T]he individuals covered by 37 C.F.R. § 1.56 cannot assume that the examiner of a par-

---

**6.** The fact that the Collins and Benfield abstract disclosed in the '563 Patent prosecution did not state that the "agent in the homogenate passed through the smallest filter, namely 0.1 μm," does not significantly effect this Court's interest in the USPO's treatment of the '563 and '778 Patents. As discussed above, it is not clear that this disclosure was material, and, moreover, the USPO was already familiar with the Wensvoort reference which concluded that PRRS was a virus. Thus, the USPO had before it both the Wensvoort reference and the Collins abstract and did not question the obviousness of either patent over these references.

ticular application is necessarily aware of other applications "material to patentability" of the application in question, but must instead bring such other applications to the attention for the examiner ..." MPEP § 2001.06(b). Schering further relies on MPEP § 2004, ¶ 9 to support its position.[7] Schering misunderstands Boehringer's argument. Schering characterizes Boehringer's reliance on the USPO's treatment of the '563 Patent as well as the USPO's treatment of the '778 Patent after reviewing the prior art cited in the '563 Patent application as an attempt to "excuse" its conduct with respect to the Collins and Benfield work. In reality, Boehringer's reliance on the USPO's actions in the '778 and '563 Patents is not meant to "excuse" any conduct, but rather is meant to illustrate, as discussed above, the immateriality of the Collins and Benfield work to the USPO's obviousness determination. There is nothing in MPEP 2001.06(b) or MPEP 2004 which precludes this Court from drawing on the USPO's treatment of the '778 and '563 Patents to support its conclusion that Schering has not proven that the Collins and Benfield work was material to the '778 Patent.

Moreover, while the MPEP counsels applicants not to "assume that an examiner will necessarily remember, when examining a particular application, other applications which the examiner is examining or has examined," *see* MPEP 2004, ¶ 9, in this case we need not "assume" that the examiners in this case remembered the Collins abstract when they considered the '778 Patent because, as discussed, above, the record shows that on August 12, 1992, Examiner Preston, who was considering the '778 Patent and '563 Patent both (a) indicated that he read the Dr. Collins ab-

stract in connection with the '563 Patent and (b) searched for prior art in connection with the '778 Patent. Tr. 21.131:5–10. The record also shows that Examiner Caputo, who ultimately permitted the '778 Patent also reviewed the Collins abstract during the pendency of the '778 Patent. Tr. 21.133:3–14; 21.134. Thus, Schering misses the mark with its argument that Boehringer its merely excusing it conduct by relying on the USPO's treatment of the '563 Patent.

In conclusion, after considering the present record, this Court finds that Schering has not made a threshold showing that the homogenate work conducted by Drs. Collins and Benfield was material to the '778 Patent.

### 2. Intent to deceive the USPO

Even if this Court were to find that Schering met its burden with respect to the materiality of Drs. Benfield and Collins's work, this Court would deny Schering's defense of inequitable conduct because Schering has not made a threshold showing that this misrepresentation was made with the intent to deceive the USPO.

Schering argues that it has presented clear and convincing evidence that Boehringer mischaracterized the Collins and Benfield work in an attempt to deceive the USPO as to the state of the prior art at the time of its invention. Specifically, Schering argues that Ms. Devlin's deposition testimony exposed her intent to "withhold the prior art status of the Collins and Benfield work (by placing it under the heading of THE INVENTION rather than in the section dealing with prior art) because, she said, she did not want to jeop-

---

7. MPEP § 2004, ¶ 9 provides:

 Do not rely on the examiner of a particular application to be aware of other applications belonging to the same applicant or assignee. It is desirable to call such applications to the attention of the examiner even if there is only a question that they might be "material to patentability" of the application the examiner is considering. It is desirable to be particularly careful that prior art or other information in one application is cited to the examiner in other applications to which it would be material. Do not assume that an examiner will necessarily remember, when examining a particular application, other applications which the examiner is examining or has examined.

ardize the potential patent rights of the University (which she believed was filing a patent application) or ultimately her employer Boehringer who would be obtaining license rights under any patent the University obtained on the homogenate." Sch. Br. at 11. In response, Boehringer argues that Ms. Devlin did not act with the intent to deceive the USPO and that she did not know the Collins and Benfield work was material.

As stated above, to succeed on a claim of inequitable conduct based on a misrepresentation, the challenging party must prove that the applicant intended to deceive the USPO with its misrepresentation. Intent "need not be proven by direct evidence" and is "most often proven by a showing of acts, the natural consequences of which are presumably intended by the actor." *Molins*, 48 F.3d at 1180–1181. However, the party alleging inequitable conduct must prove not only that the improper conduct was done intentionally, but that the intentional conduct was engaged in with the specific intent to deceive the USPO. *Id.* at 1181 (to show intent one must prove "that an applicant had the specific intent to accomplish an act that the applicant ought not to have performed, viz., misleading or deceiving the PTO"); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, 32 F.Supp.2d 265, 305 (D.Md.1998) (holding that the misstatements must have been "intentionally made with the specific intent to deceive"). "To satisfy the intent to deceive element of inequitable conduct, 'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'" *Paragon Podiatry Laboratory, Inc.*, 984 F.2d at 1189.

At her deposition, Ms. Devlin testified that "Collins' work was prior work. As to whether or not it was, you know, enabling and complete, or even who did it, all I knew is a tissue homogenate was available prior to any work by Chladek, Gorcyca and Harris in this area, this area meaning

PRRS ..." Tr. 20.28:18–22. She testified further that she did not disclose this work as prior art in the '778 prosecution because doing so "might jeopardize the patent filings by Minnesota, ..." Tr. 20.29:9–10. Ms. Devlin said that while she is always concerned about advising the patent examiner about the true state of the prior art, she also knows that "[o]ne has an opportunity to advise the patent examiner of the state of the prior art during the course of prosecution." Tr. 20.29:16–19. She further testified that since she did not "have the art in front of me, I was not going to characterize it anymore than I had to." Tr. 20.29:16–19. Ms. Devlin further explained that at some point in the prosecution of the '778 Patent she came to believe that the examiners of the '778 Patent were aware of Collins's work. Tr. 20.30–20.31.

Schering also relies on the deposition testimony of John Collins, an attorney who represented Boehringer before the USPO when the USPO objected to the '778 Patent pursuant to 37 U.S.C. §§ 101 and 112. Attorney Collins testified that nobody told him that the work under the heading "The Invention" was prior work by Drs. Collins and Benfield. Therefore, he said, he never told the examiners that this was prior work of another when he responded to the USPO's §§ 101 and 112 objections. Tr. at 20.36–20.38.

■ This Court must weigh against this evidence offered by Schering, all of the evidence of Boehringer's good faith conduct before the USPO. The Federal Circuit has consistently held that "[W]hen examining intent to deceive, a court must weigh all the evidence, including evidence of good faith." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1580 (Fed.Cir.1997)(disclosure of prior art similar to the misrepresented art was evidence of good faith). The recent case of *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380 (Fed.Cir. 1998) illustrates the importance of weighing evidence of good faith against the evidence of deceptive intent. In *Akron,* the

defendant's predecessor-in-interest, Container Industries, Inc., filed two patent applications with the USPO. The first application, referred to as the "Katz application," was filed on August 23, 1980. The second application "covering quite similar subject matter," referred to as the "Venus application," was filed on December 16, 1980. Both patents were owned by Container and filed by the same attorneys but were considered by different examiners. In the prosecution of the first application, the Katz application, the patentee did not disclose the existence of the second, related application. However, in the prosecution of the second application, the Venus application, the patentee disclosed the existence of the Katz application. A competitor alleged that the patent issued from the Katz application was unenforceable due to Container's failure to disclose the existence of the Venue application during the prosecution of the Katz application.

After conducting a two-day bench trial, the district court found that there was no inequitable conduct in the prosecution of the Katz application due to the patentee's failure to disclose the existence of the second application, the Venus application, because (a) the second application was not material to the first application and (b) the patentee's disclosure of the Katz application in its prosecution of the Venus application negated any showing of intent to deceive. On appeal, *see Akron Polymer Container Corp. v. Exxel Container, Inc.,* 1995 WL 620148 (Fed.Cir. Oct.20, 1995), the Federal Circuit reversed the district court and found that the Venus application was material to the Katz application. The Federal Circuit remanded the case for further proceedings regarding the patentee's intent to deceive the USPO.

On remand, the district court heard more evidence and held that a threshold level of deceptive intent was proven in light of the evidence that the same attorneys prosecuted both patents, knew about the similarities between the patents and knew of the possibility that the duration of the Katz patent could be extended if the examiner did not know of the Venus application or the USPO found the two patents to be patentably distinct. On appeal, the Federal Circuit again reversed the district court. The Federal Circuit held that the district court abused its discretion in failing to weigh against the evidence of deceptive intent the evidence of good faith illustrated by the disclosure in the Venus application of the Katz application. The Federal Circuit stated:

> But for the fact that Container actually disclosed the fact of copendency of the two applications to the PTO, while still failing to disclose the Venus application to the Katz application's examiner, it could be argued that the other facts in this case are sufficient to support a threshold finding of deceitful intent by clear and convincing evidence. Our confidence in such a conclusion is undermined, however, when we afford weight to the inference running contrary to deceitful intent that must be drawn from Container's disclosure of the Katz application to the Venus application's examiner.
>
> The clear error in this case is the absence of the requisite weight that must be given to Container's disclosure of the Katz application, and of the fact of the copendency of the two applications, to the PTO through the Venus application's examiner. This fact points away from an intent to deceive.... Thus, when we measure the facts of record, we conclude that a threshold level of deceitful intent has not been shown."

*Akron,* 148 F.3d at 1384. In so finding, the Federal Circuit relied upon the evidence of the patentee's good faith to reverse the district court's finding of intent and its conclusion of inequitable conduct.

Here, too there is evidence of good faith that must be weighed against the evidence offered by Schering to support its claim of deceptive intent. First, there is evidence in the record that Ms. Devlin believed that the examiner of the '778 Patent became

aware of the Collins and Benfield prior art during the prosecution of the '778 Patent. She testified that at some time during the prosecution of the '778 Patent, through either a conversation with an examiner or one of the prosecuting attorneys who in turn had spoken with one of the examiners, she believed that the examiners knew of the Collins and Benfield prior art. Tr. at 20.29–20.31. Although Ms. Devlin could not recall a specific conversation she had with an examiner or another prosecuting attorney about this prior art, her memory is otherwise supported by the record. As noted above, the same examiners who were handling the '778 Patent were also handling the '563 Patent. In the '563 Patent prosecution Boehringer disclosed to the USPO an abstract authored by Dr. Collins which included information about the Collins and Benfield homogenate work. Therefore, Ms. Devlin's belief that the examiners knew about the homogenate work is supported by the record which reveals that the examiners of the '778 Patent did, in fact, know of Dr. Collins' prior art.

Second, the fact that Boehringer disclosed Dr. Collins' abstract to the USPO in connection with the '563 Patent prosecution also weighs against a finding of mendacious intent. Like *Akron,* Boehringer disclosed the Collins prior art in the second of two patent applications but failed to disclose the Collins work as prior art in the first patent application. As the Court of Appeals held in *Akron,* the disclosure in the second application of the existence of the first application as well as the disclosure of the contested information, *i.e.,* the homogenate work, weighs heavily in the determination of nefarious intent. *See also Kimberly–Clark Corp. v. Procter & Gamble Dist. Co.,* 973 F.2d 911, 918 (Fed. Cir.1992) (disclosing the contested information in a related patent prosecution is not "consistent with an intent to deceive.") In light of the fact that Boehringer put the USPO on notice of this prior art, it is difficult for Schering to make a threshold showing of deceptive intent by clear and convincing evidence.

Third, the record supports Boehringer's position that it was not uncommon in the biology field to include the starting-off point in "The Invention" section of a patent application. Mr. Gould testified that including the starting point in the "Invention" section was normal practice in 1991. Tr. at 21.88–21.90. Mr. Manbeck also testified that it is the claims rather than the text under the heading "The Invention" which articulate the scope of the patentee's invention. In fact, Schering's '401 Patent covering Schering's infringing vaccine demonstrates this point. In the '401 Patent application, Schering listed the homogenate work, which was its starting off point, under the heading "Detailed Description of the Patent," rather than under its background section. *See* Tr. at 20,83–20.89.

In sum, after weighing all of the evidence in the record on the issue of Boehringer's intent to deceive the USPO as to the true state of the prior art, this Court finds that the evidence offered by Schering does not leave this Court with an abiding conviction that it is highly probable that Boehringer intended to deceive the USPO when it included the Drs. Collins and Benfield homogenate work under the title "The Invention." Therefore, even assuming the materiality of the Collins and Benfield work and that Boehringer misrepresented this work to the USPO, Schering has failed to establish that Boehringer acted with the requisite nefarious intent to satisfy a finding of inequitable conduct.

In conclusion, this Court has considered all of the evidence before it relating to materiality as well as intent and has found that Schering has failed to show that Boehringer engaged in inequitable conduct before the USPO with respect to the Collins and Benfield homogenate work.

### 3. Balancing

Since Schering failed to prove the materiality of the Collins and Benfield homogenate work and likewise failed to prove

that Boehringer intended to deceive the USPO, this Court need not balance the materiality and the intent to determine if the level of culpability warrants the invalidation of the '778 Patent. Even if Schering were successful in showing that there was some threshold showing of materiality and intent, upon balancing that slight materiality and the evidence of Boehringer's deceptive intent, this Court, in its discretion, would not find Boehringer's conduct to be so culpable as to warrant the invalidation of the entire '778 Patent.

## B. The Work of Drs. Dea and Van Alstine

■ Schering argues that Boehringer's failure to provide the USPO with a copy of Drs. Dea and Dr. Van Alstine's articles which were published as part of the Livestock Conservation Institute Proceedings in October 1990 (hereinafter referred to as "LCI" or "L.C.I.") also constitutes inequitable conduct.[8] I disagree and find that Schering has failed to prove that Drs. Dea and Van Alstine's works were material and that Boehringer's failure to refer to those works in prosecuting the '778 Patent was committed with the intent to deceive the USPO.

### 1. Materiality of the work of Dr. Dea and Van Alstine

In this case, Schering argues that the works of Drs. Dea and Van Alstine were material because "they were postulating that an EMCV [encephalomyocarditis virus] variant and SIV [swine influenza virus] respectively might be the causative agent of MSD. They were also suggesting specific cell lines, including Vero and MA–104, for use in isolating and growing the MSD agent from a tissue homogenate." Sch. Br. at 19. Schering argues further that the materiality of these references is

conceded by Boehringer statement in the "Background" section of the '778 Patent which states "The primary causative agents being studied, as reported in the published literature, include encephalomyocarditis virus (EMC), swine influenza virus (SIV), mycotoxins and chlamydia." PTX1 at B067049. Schering also argues that Dr. Dea's work was not cumulative of other work cited by Boehringer because Dr. Dea's work added that "the agent causing the respiratory and reproductive symptoms in pigs in Quebec had been isolated on Vero cells." Id. at 22. Finally, Schering argues that even if EMCV had been ruled out as the causative agent of PRRS by April 1991, the date of Boehringer's invention, the Dea reference was still material because Dr. Dea posited "that it was a pneumotropic EMC variant [rather than traditional EMC] which was causing the respiratory and reproductive symptoms." Sch. Br. at 28.

With respect to Dr. Van Alstine's work, Schering argues that "Van Alstine postulated that SIV might be the causative agent of MSD, and suggested the inclusion of MA–104 cells (claim2 ) in an array of cells." Id. at 20. Schering also argues that the materiality of these references was heightened in 1994 when the USPO issued a rejection of the '778 Patent pursuant to 35 U.S.C. § 101 for lack of utility. Id.

Finally, Schering argues that (a) Boehringer errs in its argument that the USPO had the entire LCI Proceeding before it when it evaluated the '778 Patent, (b) even if the USPO did have the entire LCI Proceedings, Boehringer's failure to disclose this material to the USPO in connection with the '778 Patent amounts to inequitable conduct and (c) Boehringer's disclosure of the Dea and Van Alstine references in

8. Although Schering affirmatively waived (orally and in writing) its right to rely upon Dr. Van Alstine's article to support its defense of inequitable conduct, see Tr. at 20.11; Tr. at 20.4–20.10 (no reference to materiality of Van Alstine during Schering's opening remarks), in the interest of completeness, this Court will address the merits of Schering's recently renewed reliance on the Van Alstine reference in support of its defense of inequitable conduct.

connection with the '563 Patent cannot excuse Boehringer failure to disclose these references in connection with the '778 Patent.

Boehringer counters that Drs. Dea and Van Alstine's references are not material because (a) the USPO considered these references and found them to be immaterial, (b) the references before the USPO conclusively ruled out EMCV and SIV as possible causes of PRRS rendering these references immaterial and (c) the references could not render the '778 Patent obvious because the works lack many claim elements. Expanding on these three arguments, Boehringer asserts that "the fact that Dr. Dea grew EMCV on Vero cells from 4 of the 19 herds he studied does nothing to increase the likelihood that the causative agent of MSD would grow on monkey cells ... Because no one, including Dr. Dea, would conclude that the MSD agent grew on simian cells, Dea actually *teaches away* from the claimed invention, and therefore cannot possibly be considered material." *Id.* at 18 (emphasis in the original). Boehringer also argues that the immateriality of these references is illustrated by the fact that the USPO did not issue an obviousness rejection in connection with the '563 Patent prosecution during which Boehringer disclosed the Dea and Van Alstine references. Boehringer adds that this evidence is particularly telling in this case because the same examiners who were considering the '778 Patent reviewed the entire LCI Proceedings, including Drs. Dea and Van Alstine's articles, in connection with the '563 Patent prosecution. Boeh. Br. at 15.

Boehringer characterizes Schering's argument that Dea taught that a variant of EMCV was responsible for the PRRS outbreaks as "newly-minted" and challenges that this new argument merely reveals Schering's misgivings about its own argument that Dea was material because of his work with EMCV, rather than a variant of EMCV. Boehringer responds to the merits of Schering's argument by asserting that the "EMC variant" argument is flawed because any variant of EMCV had been ruled out at the time of the invention because the variant was not serologically distinct from typical EMCV and the serological tests reported in Wensvoort were negative for EMCV.

With respect to Schering's argument that the Dea and Van Alstine references became more material after the USPO issued a utility rejection pursuant to 35 U.S.C. § 101, Boehringer argues that Schering has misinterpreted the USPO's rejection. Schering argues that the § 101 rejection was made because the examiner did not believe that Boehringer had the causative agent of PRRS and instead thought that EMCV may have been the cause of PRRS.

The first consideration for this Court is whether the information not disclosed to the USPO in connection with the '778 Patent was material. As discussed above, that inquiry is controlled by 37 C.F.R. § 1.56 and the caselaw interpreting that section. Where a party alleges inequitable conduct based upon the omission of prior art, that party must prove (a) that the prior art was material, (b) that the patentee was aware of that materiality and (c) that the patentee failed to disclose that prior art reference with an intent to deceive the USPO.

### a. Schering's EMCV Argument

I will first take up Schering's main argument—that the Dea and Van Alstine references were material to the '778 Patent prosecution because these references postulated that an EMCV variant and SIV might be the causative agent of MSD and they suggested specific cell lines for use in isolating and growing the MSD agent from a tissue homogenate.

This Court has already described the Dea and Van Alstine references as follows:

> The article written by Dr. Dea entitled "Virus Isolations from Farms in Quebec Experiencing Severe Outbreaks

of Respiratory and Reproductive Problems," distributed at the L.C.I. Conference in 1990, documented the efforts of Dr. Dea's team to determine the causative agent of PRRS in Canadian herds. Dr. Dea noted that he examined tissues and lesions from a number of infected pigs. He found that a fluorescent antibody examination of the lesions which accompany the disease revealed that tests for "porcine parvovirus (PPV) transmissible gastroenteritis virus (TGEV) and swine influenza virus (SIV) were negative." Pl. Exh. 26 (Dea at p. 68). He further noted that prior to attempting to isolate the virus "nonsignificant antibody titers against TGEV, PPV, SIV, bovine viral diarrhea virus (BVD) and infectious bovine rhinotracheitis virus (IBR) were found in the sera of convalescent pigs or sows." *Id.*

Dr. Dea reported that with the use of Vero cells, encephalomyocarditis virus (EMCV) was isolated from infected tissues from four different herds afflicted with the symptoms of PRRS. *Id.* He further noted that these results were not duplicated on porcine fallopian tube cells, porcine testicle cells or baby hamster kidney cells. *Id.* Dr. Dea also reported that antigens for EMCV were demonstrated "in more than 33% (³⁹⁄₁₁₈) of the clinical specimens." *Id.* Dr. Dea further noted that he isolated the influenza virus on embryonating eggs and that the influenza isolate "could be propagated in MDCK [monkey kidney] cells provided trypsin was added to the culture medium." Pl. Exh. 26 (Dea at 70). Dr. Dea concluded that EMCV was detected in the sick herd population but that "experimental inoculation studies were needed to confirm the existence of a pneumotropic EMCV variant [that] may have been associated to outbreaks of respiratory and reproductive problems in Quebec pig farms." Pl. Exh. 26 (Dea at 71).

Dr. Van Alstine's article "Past Diagnostic approaches and Findings and Potentially Useful Diagnostic Strategies," was also distributed and presented at the L.C.I. Mystery Swine Disease meeting in 1990. Dr. Van Alstine reported that he found a three to four fold increase in swine influenza virus (SIV) titers on several farms effected by PRRS. Pl. Exh. 26 (Van Alstine at 55). Dr. Van Alstine further reported that tissues from the diseased herds were tested for several diseases including SIV and EMC and that "in most herds, the same tissues ... were placed on swine testicular cells (ST), dog kidney cells (DK), and baby hamster kidney cells (BHK). In addition three of the eight intensively studied farms had the same tissues placed on porcine and bovine turbinate cells, porcine kidney cells (PK–15), monkey kidney cells (MA104), and feline kidney cells (CRFK)." Pl. Exh. 26 (Van Alstine at 54). He noted that two herds were positive for rotavirus, two were positive for SIV by FA, one herd was positive for SIV by virus isolation and parvovirus was isolated from one herd. Dr. Van Alstine, however, did not disclose which cell line produced these results. *Id.* In the end, Dr. Van Alstine concluded that, *inter alia*, since swine influenza was detected frequently among infected herds, "swine influenza virus remains as one of the prime suspects for at least one of the causes of Mystery Pig Disease in Wabash County, Indiana." Pl. Exh. 26 (Van Alstine at 58).

*Boehringer v. Schering–Plough,* 68 F.Supp.2d 508, 536 (D.N.J.1999) (*"Boehringer III"*)

The materiality of these references depends, at least in part, on whether the information disclosed therein is merely cumulative of other references disclosed to the USPO and whether the information contained in these references had been negated by later research disclosed to the USPO. Under both pre and post amendment caselaw, a patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less mate-

rial than those already before the examiner. *See Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 992 (Fed.Cir.1988); 37 C.F.R. § 1.56. Thus, a charge of inequitable conduct may be rebutted by proof that the subject reference was "merely cumulative" of another reference already disclosed. *Elk Corp.*, 168 F.3d at 30–31.

With respect to whether Dea's conclusions that EMCV might be the cause of PRRS, this Court finds that Schering has not proven the materiality of this reference by clear and convincing evidence under either the pre–1992 standard or the post–1992 standard of materiality. Even assuming that it was material to the USPO's consideration of the '778 Patent to know that researchers considered EMCV (and a variant of EMCV) as a possible causative agent of PRRS, the USPO already had before it a compilation of articles which discussed PRRS research which focused on EMCV. Specifically, Boehringer cited in its '778 Patent prosecution, among other references, (a) Loula's article in Agri–Practice published in January/February 1991, (b) Joo's article which was part of the 1990 LCI conference, (c) the Wensvoort article discussed above and (c) Pol's article which was published along with the Wensvoort article. To the extent that the materiality of Dea's work rests in his disclosure that EMCV or a variant thereof was thought to be responsible for the PRRS outbreaks, this information was disclosed to the USPO in the Loula reference as well as the Joo reference.

The Loula reference, entitled "An Update for the Practitioner, Mystery Swine Disease," was published in January/February 1991, months after the Dea and Van Alstine references were shared at the LCI Conference but months before Boehringer's invention. PTX 7. Dr. Loula's article recounted the research by others and that:

"Without scientific data, it seems that 60 to 70% of the herds have responded in a positive manner [to the EMC vaccine], especially when experiencing poor farrowing and nursery performance. The

history of a farm reported on by Dr. Wayne Freese of Worthington, Minnesota demonstrated a dramatic response to EMC vaccine usage (Table 3). This author, however, has experienced two instances in which vaccination with EMC at least 1 month prior to the outbreak of MPD did not prevent the acute form of the disease, although the duration of clinical signs seemed shorter than usual."

Loula at p. 33. Loula also stated

Encephalomyocarditis virus has been studied extensively by researchers at the University of Minnesota and Oxford Laboratories in Worthington, Minnesota. These researchers feel that they have fulfilled Koch's postulates by the repeated observation of the following clinical signs: heavy abdominal breathing in piglets; dilated hearts in piglets; and mummies.

"In a serological survey, Dr. Jeff Zimmerman of the Iowa State Veterinary Diagnostic Laboratory at Iowa State University in Ames found that a high percentage of pigs carry titers to EMC...."

Loula at p. 24. Thus, in addition to contributing his own thoughts on the PRRS mystery, Loula also reported the work of other researchers who believed they had fulfilled Koch's postulates with EMC. Indeed, Loula even referred to the work by Dr. Dea which is the basis of Schering's current defense of inequitable conduct. In footnote 2, Loula cited "Dea, S. et al: Virus Isolation from Farms in Quebec Experiencing Sever Outbreaks of Respiratory and Reproductive Problems. Mystery Pig Disease Meeting Sponsored by Livestock Conservation Institute, Denver, Colorado, October 6, 1990."

Boehringer also disclosed the Joo reference to the USPO in connection with the '778 Patent prosecution. The Joo reference published as part of the LCI Proceedings entitled "Encephalomyocarditis Virus as a Potential Cause for 'Mystery Swine Disease,'" also reported the re-

search on EMCV. In the introductory paragraph, Joo stated "During the last 3–5 years, EMCV infection has received great attention in several midwestern states because the virus has been proposed as a cause for so called 'Mystery swine disease'." Joo at 62. Joo also stated "It is hypothesized that the respiratory syndrome currently occurring in swine farms with 'Mystery swine disease' may have been due to a pneumotropic EMCV variant." Joo at 64; *see also* Tr. at 21.56–21.57 (Dr. Steece testified that Joo and Dea both suggested that a pneumotropic variant of EMC might be at play). Joo then recounted the positive correlations between ECMV and PRRS and also listed the "three important areas [that] must be investigated before we can conclude EMCV as a definitive cause for the 'mystery swine disease' syndrome." Joo at 65.

Thus, the Loula and Joo references which Boehringer disclosed to the USPO characterized, among other things, the attention EMCV received in connection with PRRS, noted that others believed they had fulfilled Koch's postulate with EMCV, noted that a pneumotropic variant of EMC was studied in connection to PRRS, cited directly to the Dea reference which is the subject of Schering's inequitable conduct defense and noted that further research was needed to investigate EMCV's role in the PRRS outbreaks. The breadth of information disclosed to the USPO in these references seriously undercuts Schering's offer of proof that Dea's work was not cumulative of the other references cited to the USPO. Although the Loula and Joo references did not disclose that Dea had isolated EMCV from infected herds, Schering has not proven that this finding renders the Dea reference non-cumulative given the disclosure in Loula that others believed they had fulfilled Koch's postulates with EMC. The fulfillment of Koch's postulates, in turn, meant that researchers

believed they had isolated EMC from infected herds.[9] Therefore, Schering has not proven that Dea's belief that he had isolated EMC from infected herds renders his work non-cumulative, material prior art. Thus, because Boehringer disclosed Loula and Joo to the USPO, Schering has not proven that Boehringer kept the USPO ignorant of either the research regarding EMCV (or a variant thereof) and its possible role in the PRRS outbreaks or the fact that further research was suggested in this field. Therefore, to the extent Schering argues that the materiality of the Dea reference rests in its disclosure that EMCV (or a variant thereof) might be a cause of PRRS, Schering has failed to convince this Court that the Dea reference is not cumulative of Joo and Loula and therefore material.

In addition to Schering's failure to prove that the Dea reference is not cumulative over the Loula and Joo articles disclosed to the USPO, Schering has not proven the materiality of Dea in light of the later research which Boehringer disclosed to the USPO. Although this Court need not resolve the parties' dispute of whether EMCV had been conclusively ruled out as a potential cause of PRRS, the later research submitted to the USPO is pertinent to this Court's inquiry because it diminished whatever relevance the EMCV work had to the USPO's consideration of the '778 Patent. Indeed, the later research disclosed at the very least, a trend away from EMCV as a possible cause of PRRS and progress towards a positive identification of the agent responsible for PRRS.

As discussed above in greater length, Boehringer cited the Wensvoort reference to the USPO in the prosecution of the '778 Patent. By giving the USPO a copy of Wensvoort, Boehringer showed the USPO both the latest progress in PRRS research

---

9. This is a necessary conclusion because Koch's postulates requires the isolation of the organism, growth of the organism, infection in a healthy host and re-isolation of the organism. Thus, for one to believe that s/he has satisfied Koch's postulates, one must believe they have isolated and re-isolated the suspect organism.

as well as the previous EMCV research which the newer research directly challenged. The Wensvoort reference concluded that EMCV was not etiologically responsible for PRRS based on negative serological tests as well as the positive tests for a new viral agent termed Lelystad Virus. Wensvoort reported "We tested four groups of pigs for the causative agent of MSD. On one occasion, we isolated EMCV, which has been suggested as the possible cause of MSD (9) ... We think it is unlikely, however, that any of these viruses cause MSD, since no clear pattern of seroconversion against these agents was found in MSD-affected sows." Wensvoort at 127. Indeed, Wensvoort reported that only two sows seroconverted for EMCV compared to 123 sows which seroconverted for Lelystad Virus. *Id.* In reporting his success in identifying the viral agent responsible for PRRS, Wensvoort did not shy away from referring to the earlier research which hypothesized about EMCV's role in the PRRS outbreaks. Indeed, footnote 9 of the Wensvoort reference, referred to above, cited to "Joo HS, Christiansen B, and Kim H. Encephalomyocarditis virus as a potential cause for mystery swine disease. In: Proceedings Mystery Swine Disease Committee Meeting. October 6, 1990. Denver, Colorado. Livestock Conservation Institute, Madison WI, USA." In addition, Wensvoort referred in footnote 11 to Loula's article from the LCI conference which concluded "EMC virus probably best fits the picture. Researchers at the University of Minnesota feel that they have fulfilled Koch's postulates ..." LCI at 38. By citing to the prior art regarding EMCV, Wensvoort was directly challenging their findings. More importantly, by disclosing Wensvoort to the USPO Boehringer did not hide the EMCV (and EMCV variant) research from the USPO.

In addition to the Wensvoort reference, Boehringer also disclosed the Pol reference to the USPO in the prosecution of the '778 Patent. The Pol reference, "Pathological, ultrastructural, and immunohistorchemical changes caused by Lelystad virus in experimentally induced infections of mystery swine disease (synonym: porcine epidemic abortion and respiratory syndrome (PEARS))" published along with the Wensvoort reference in The Veterinary Quarterly also concluded that Lelystad Virus had been definitively identified as the cause of PRRS. In drawing this conclusion, Pol confirmed that EMCV was not responsible for the PRRS outbreaks. Like Wensvoort, Pol cited the prior art researching EMCV as a possible cause of PRRS. In the Acknowledgments section of that article, Pol stated "Recently Dea, et al suggested that infection with encephalomyocarditis virus is associated with these changes. Wensvoort, et al have demonstrated, however, that encephalomyocarditis virus is not the cause of mystery swine disease." Pol at 143. Like Boehringer's reference to Wensvoort, its reference to Pol shows that Boehringer neither kept the EMCV work or the Dea reference from the USPO. Not only does this disclosure reflect on Boehringer's good faith before the USPO, as discussed below, this disclosure also demonstrates Schering's failure to prove that the previous EMCV research was withheld from the USPO.

Therefore, the later research submitted to the USPO not only informed the USPO of the very article which Schering now relies upon in its defense of inequitable conduct, but those articles also informed the USPO of the conclusions of the prior EMC research and reflect the limited relevance the EMCV research had on the continuing work into PRRS. In this context, Schering has failed to prove by clear and convincing evidence that Dea's work with EMCV was material to the USPO's consideration of the '778 Patent.[10]

---

10. Schering's expert, Dr. Steece challenged Dr. Wensvoort's conclusion that the negative serologocical tests for EMCV ruled out the possibility that EMCV caused PRRS. *See* Tr. at 21.44–21.53. As stated above, this Court need not determine whether the serological

### b. Dea's Use of Vero Cells

Finally, Schering argues that Dea was material over the other cited art because of Dea's use of Vero cells to isolate EMCV. Schering argues that if the examiner had the Dea reference "the Examiner could have made a *prima facie* anticipation rejection under 35 U.S.C. § 102 arguing that Dea *et al.* anticipated Harris (claim 1) because Dea isolated the MSD agent (or what was believed to be the MSD agent) on simian cells using conventional cell culture conditions before Harris did." Sch. Br. at 22. Schering also argues that the Examiner could have made a prima facie rejection of the '778 Patent under 35 U.S.C. § 103 that Dea's work rendered the '778 Patent obvious. Sch. Br. at 23.

With respect to Schering's argument that Dea would have been "important" to the examiner's consideration under 35 U.S.C. § 102, Schering has failed to meet its burden of proof in this respect. Schering argues "Given that Dea had already discovered that the agent causing the respiratory and reproductive symptoms in four of his Quebec farms could be isolated on Vero cells, a simian cell, the Examiner could have questioned whether or not Dea had isolated the agent causing Mystery Swine Disease on a simian cell line (Vero) before Mr. Harris did." Sch. Br. at 22. Schering does not offer any transcript citations in support of its argument, cites to only one case and does not fully articulate the legal and factual basis for its argument. Notwithstanding the paucity of support offered by Schering in this respect, this Court has considered the Dea reference and the testimony offered in relation thereto and concludes that Schering has failed to meet its burden of proof that the Dea reference was material to the USPO's consideration of whether the '778 Patent had been anticipated.

Simply put, Schering has not proven that a reasonable examiner would have

considered Dea important under 35 U.S.C. § 102. In relevant part, section 102 states that an applicant shall not be entitled to a patent if:

> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, . . .

35 U.S.C. § 102(a) and (b). The Federal Circuit has recently held that

> invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation. Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document. Incorporation by reference provides a method for integrating material from various documents into a host document—a patent or printed publication in an anticipation determination—by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.

*Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272 (Fed.Cir. 2000) (internal citations omitted).

Essentially, Schering has not offered sufficient evidence for this Court to conclude that a reasonable examiner would have found Dea to be important to his/her

tests conclusively ruled out EMCV because Schering has not proved that Dea was not cumulative of the references cited to the

USPO and any relevance Dea possessed over Loula and Joo was greatly diminished by Wensvoort and Pol.

consideration of the '778 Patent under 35 U.S.C. § 102. To be important to the USPO's consideration of the '778 Patent, the Dea reference would have had to at least, embody every element of the '778 Patent. Schering has not proven by clear and convincing evidence that Dea did this. Dea did not disclose the temperature at which the cells should be inoculated. Claim 1 of the '778 Patent state that the cells must be incubated at 34–37 degrees Celsius. Dea did not discuss whether to use serum in the growth and isolation of PRRS. *See* Tr. at 20.113–115. Claim 1 of the '778 Patent provides that growth would occur in "the presence of serum in a suitable growth medium." In addition to these facial deficiencies to Dea's impact on the '778 Patent under 35 U.S.C. § 102, it cannot go without notice that (a) Dea did not disclose the isolation of a new viral agent which was the subject of the '778 Patent and (b) Dea did not have much success in his experiments. Dea reported that he recovered EMCV from only 4 of the 19 pig farms he studied. Thus, Schering has failed to prove that a reasonable examiner would have considered Dea important for its consideration of the '778 Patent under 35 U.S.C. § 102.

Next, Schering argues that Dea would have been "important" to the examiner's consideration under 35 U.S.C. § 103 because Dea disclosed, in relevant part, that he was able to isolate EMCV on Vero cells in 4 of the 19 herds he studied.

Again, this Court has considered the evidence before it and has credited Boehringer's witnesses who testified that this information would not have been material to the obviousness determination. After studying this case for years, this Court finds that Schering has not proven the materiality of Dea's use of VERO cells to isolate (in only 4 of 19 potentially infected herds) a known swine virus with which others believed they had fulfilled Koch's postulates regarding only some of the reported symptoms associated with PRRS. This conclusion is even more pronounced in light of the other art which was disclosed to the USPO.

Indeed, after being confronted on cross-examination with the other art in this case, Dr. Steece's opinion with respect to the materiality of the Dea reference weakened. At one point, Dr. Steece testified:

I think the information and the literature is very supportive of trying to—or suggestive that this perhaps could be EMC. It is well-known there were variables of EMC, that is there were neurotropic [sic] variants, that there were myocardial variance [sic]. Dr. Dea's suggesting what he had might be a pneumotropic variables [sic]. Serologists, as reported in many papers, were very inconsistent. We see an inconsistent serological response. You got actually a strong reference with Dea, where he is actually getting isolates. He is getting serologies.

I can't say that you would even—I think I would follow Dr. Van Alstein's [sic] guidance and not put on the blinders and look at it so narrow, but look in the breadth of all of the information available to base my conclusions on whether or not to isolate it or work it up.

Tr. at 21.51–21.52. Although Dr. Steece later testified that after reviewing Dea's work one of ordinary skill would use vero or simian cells to isolate and grow the unknown virus, Dr. Steece's testimony taken as a whole falls short of proving by clear and convincing evidence that the Dea reference (or the other references discussed herein) were material to the USPO's obviousness determination. His testimony that he would not put blinders on does not rise to the level of rendering the Dea reference important to the USPO's consideration of the '778 Patent. Moreover, on the full record before this Court, Dr. Steece's testimony did not impress this Court that the Dea reference would have given one of ordinary skill a reasonable expectation of success isolating PRRS on simian/VERO cells.

Thus, after considering all of the evidence presented on this issue, Schering has not proven the materiality of Dea based upon what it calls the added disclosure of the use of Vero cells to isolate the causative agent of PRRS.

### c. Dr. Van Alstine's Work

With respect to the Van Alstine reference, like the Dea reference, the materiality of the Van Alstine reference also depends, at least in part, on whether the information disclosed therein is merely cumulative of other references disclosed to the USPO and whether the information had been negated by later research disclosed to the USPO. Schering argues that not only did Van Alstine postulate that SIV might have been causing PRRS, but he suggested "the inclusion of MA–104 cells (claim2 ) in an array of cells." Sch. Br. at 20.

As stated above, Van Alstine noted that two herds were positive for rotavirus, two were positive for SIV by FA, one herd was positive for SIV by virus isolation and parvovirus was isolated from one herd. Van Alstine at p. 54. Van Alstine also reported that at least six submissions from at least 5 farms were submitted to NVSL for chlamydia and virus isolation ... Parvovirus was isolated from one herd. All other viruses were negative on isolation and selected foreign animal diseases such as hog cholera and African swine fever were also negative. Van Alstine at p. 57. In the end, Dr. Van Alstine concluded that, *inter alia*, SIV was "demonstrated by FATS, serology or lesions (bronchiolitis) in at least 5 of the 8 extensively investigated farms," such that "swine influenza virus remains as one of the prime suspects for at least one of the causes of Mystery Pig Disease in Wabash County, Indiana." Van Alstine at 58. Schering, however, has not proven that this conclusion is not cumulative of the references cited to the USPO. Specifically, the Loula reference cited by Boehringer stated, "Swine Influenza Virus (SIV) has been studied primarily in Cana-

da and by Dr. William Van Alstein [Sic] of Purdue University. The primary lesion associated with SIV is Interstitial pneumonia observed on post-mortem examination. It has been speculated that this is the reason for the very pronounced rapid abdominal breathing seen both in piglets and older pigs affected with MPD." Loula at p. 24. Loula then cited in footnote 3 to "Van Alstine W: Past Diagnostic Approaches and Findings and Potentially Useful Diagnostic Strategies. Mystery Pig Disease Meeting Sponsored by Livestock Conservation Institute, Denver, Colorado, October 6, 1990."

Moreover, the Wensvoort reference reported that other researchers looked at SIV in connection with PRRS. Specifically, Wensvoort stated "No causative agent has as yet been identified, but infections with ... swine influenza virus, ... have all been suggested as possible causes (11, 13, 31)." Wensvoort also challenged Van Alstine's results by reporting success isolating the Lelystad Virus from sera provided by Dr. Van Alstine. Wensvoort stated "very recently we have detected antibodies directed against LV in sear from pigs from MSD in Germany and in the United States (courtesy Dr. Van Alstine, West Lafayette) (unpublished results)." Wensvoort at p. 128.

Thus, as with the Dea reference discussed above, Boehringer's disclosure of other prior art did not keep the SIV research from the USPO. In addition, whatever relevance the SIV research had to the '778 Patent was greatly diminished by Wensvoort's work which was before the USPO and challenged Van Alstine's work. Therefore, Schering has failed to prove by clear and convincing evidence that Van Alstine was material prior art based upon Van Alstine's work with SIV.

Next, Schering argues in the alternative that Van Alstine was material not for its disclosure of SIV as a possible cause of PRRS but because Van Alstine reported his work with MA–104 cells. Specifically, Schering argues that Van Alstine is rele-

vant because it "suggested the inclusion of MA–104 cells (claim2 ) in an array of cells." Sch. Br. at 20. This Court will not again respond to Schering's argument that Van Alstine made it "obvious to try" MA–104 cells. Even if Van Alstine taught one of ordinary skill to include MA–104 cells in a test array, without also teaching an expectation of success on MA–104 cells, Van Alstine could not have been important to a reasonable examiner considering Van Alstine in light of 35 U.S.C. § 103.[11]

### d. Other Evidence of Immateriality

This Court's conclusion that Schering has not proven even a threshold level of materiality of the Dea and Van Alstine references by clear and convincing is again supported by the actions of the USPO in connection with both the '778 and '563 Patent prosecutions. Although Boehringer did not cite to the Dea and Van Alstine articles in the '778 Patent prosecution, it is without serious dispute that Dea and Van Alstine were before the USPO in the '563 Patent prosecution.[12] Given that Dea and Van Alstine were before the USPO, the USPO's actions in both the '563 and '778 Patent prosecutions support this Court's conclusion that those references were not material to the USPO's consideration of the '778 Patent.

First, this Court's finding that Schering has failed to prove the materiality of the Dea and Van Alstine references is buttressed by the USPO's failure to question Boehringer or issue an obviousness rejection in the '563 Patent prosecution over the

Dea and Van Alstine references. Mr. Gould, Boehringer's expert, testified that on August 12, 1992 Examiner Preston considered the LCI Proceedings in connection with the '563 Patent. Tr. at 21.128. Moreover, there is sufficient evidence that the examiners reviewed the other references cited by Boehringer which explicitly referred to the LCI Proceedings. After reviewing the LCI Proceedings which included the Dea and Van Alstine references, the examiners considering the broader '563 Patent and did not question Boehringer or reject the '563 Patents over the Dea and Van Alstine references. While the conduct of these examiners in connection with the '563 Patent is not binding on this Court in considering whether the references were material, the USPO's conduct is instructive and supports this Court's independent determination that Schering has failed to prove that these references were material.

Second, this Court's findings are further supported by the USPO's reaction to Dea and Van Alstine in the '778 Patent prosecution. Mr. Gould, Boehringer's expert, testified that based upon his review of the file history for the '778 Patent, he believed that the examiners in the '778 prosecution would have known of the Dea and Van Alstine references. Tr. at 21.116–117. He testified that the examiners of the '778 Patent "had full access to and certainly had knowledge of the Dea and Van Alstine reference." Tr. at 21.117. Mr. Gould's opinion was based on (a) Loula's reference to the Joo article with a citation to the LCI

---

**11.** This conclusion is supported by Van Alstine's failure, even into 1992, to grow PRRS on any cells. Van Alstine's continued failure seriously undermines Schering's argument that Van Alstine taught one of ordinary skill to do what Boehringer did or that Van Alstine's work would have been important to the USPO's obviousness inquiry.

**12.** Schering makes a failed attempt to argue that the entire LCI Proceedings booklet was not before the USPO. The evidence is to the contrary. First, the '563 Patent refers to the LCI Proceedings. Second, the USPO's own use of the references indicates that it had the

entire LCI proceedings. *See* Tr. at 20.103, 20.112 and 21.123. Schering's argument that the USPO did not know that the proceedings of the LCI conference were published is also flawed. Not only did Wensvoort cite to Loula's article as being from "In: Proceedings Mystery Swine Disease Committee Meeting. October 6, 1990. Denver, Colorado. Livestock Conservation Institute, Madison WI, USA." Footnote 13 referring to Mengling et al., uses a similar citation. Also, the Loula article referred to Dea and Van Alstine as being from the same conference.

proceedings, (b) the office action for the '563 Patent dated September 8, 1994 where there is a reference to Loula, which, in turn, refers to Dr. Van Alstine's work and Dr. Dea's work, (c) that the citation form used by Loula and the examiner revealed the examiner's understanding that there was a publication of the LCI Proceedings and (d) that Examiner Caputo's office action dated September 5, 1994 referred to Joo as being part of the LCI proceedings. Tr. at 21.118–21.125. He also testified that the file history from the '778 Patent reveals that on August 12, 1992, Examiner Preston signed an office action on the '778 Patent, he also reviewed the LCI Proceedings in connection with the '563 Patent.

After having considered the LCI proceedings while the '778 Patent was pending, the examiners did not issue an obviousness rejection based upon the Dea and Van Alstine references. The USPO's inaction over these references supports this Court's conclusion that Schering has failed to prove a threshold level of materiality by clear and convincing evidence.[13]

### e. Schering's Other Arguments

Schering also argues that the materiality of these references was heightened in 1994 when the USPTO issued a rejection of the '778 Patent pursuant to 35 U.S.C. §§ 101 and 112. *Id.* Given this Court's conclusions that Schering has not proven a threshold level of materiality with respect to the Dea and Van Alstine articles, this argument does not add much to this Court's analysis. Specifically, given the cumulative nature of these references as well as the impact the later research would have on a reasonable examiner and the USPTO's action in the '563 Patent prosecution, Boehringer's failure to cite the Dea and van Alstine articles after the USPTO's sections 101 and 112 rejection does not form a basis for Schering's defense of inequitable conduct.

Next, Schering argues that Boehringer has conceded the materiality of the Dea and Van Alstine references by referring to EMC and SIV in the background section of the patent as primary causative agents "being studied." This argument is specious. Boehringer's reference to EMC and SIV does not mean *ipso facto* that Dea and Van Alstine's work was material to the USPTO's consideration of the '778 Patent. All this reference means is that Boehringer disclosed the existence of prior research which hypothesized a connection between

---

**13.** Moreover, given the fact that these references were before the USPTO, there is an argument that these references cannot support a finding of inequitable conduct. The trend from the Federal Circuit is to reject an inequitable conduct defense based upon information which was not disclosed by the patentee but was otherwise before the USPTO. Indeed, the Federal Circuit has held that "[W]hen a reference was before the examiner, whether through the examiner's search or the applicant's disclosure, it cannot be deemed to have been withheld from the examiner." *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1582 (Fed.Cir. 1991); *see also Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1185 (Fed.Cir.1995) (it was clearly erroneous to invalidate a patent based upon information which was cited by the USPTO even thought the applicant did not bring it to the USPTO's attention). This line of reasoning is consistent with the amended Rule 1.56 states that "[T]he duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was *cited by the Office or submitted to the Office ...*" 37 CFR § 1.56(a) (1992) (emphasis added). Thus, Rule 1.56 and the Federal Circuit are now consistent in holding that where an examiner ultimately considers a reference, the applicant's failure to disclose that reference to the USPTO cannot support a finding of inequitable conduct. The Federal Circuit has explained that "[A]lthough the conduct giving rise to judgments of unenforceability thus occurs before the examiner, the offense deserves its penalty because the processes of the PTO have been transgressed." *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1383 (Fed.Cir.1998). Therefore, the penalty accompanying a successful defense of inequitable conduct is not warranted where the processes of the USPTO has not been transgressed, such as where the prior art is otherwise before the USPTO.

EMC/SIV and PRRS. Boehringer then submitted references to the USPTO which discussed that research. That is all. Thus, the reference to SIV and EMC in the "Background" section of the '778 Patent does not further Schering's offer of proof.

Schering also errs in its argument that the materiality of the Drs. Dea and Van Alstine references is proven by the disclosure of these references in other patent prosecutions. Schering argues that the materiality of these references is demonstrated by their disclosure by the law firm Merchant, Gould which represented Drs. Collins and Benfield in connection with the '713 and '444 applications. The materiality of the LCI Proceedings, however, cannot be tested by another's disclosure in relation to a patentably distinct application. Moreover, this argument is inconsistent with Schering's argument that the MPEP teaches the over-inclusion of art rather than the under-inclusion of art. In one breath Schering argues that the MPEP teaches patentees to be over-inclusive of art that might arguably (though not clearly) be relevant, and in the next breath Schering argues that materiality is proven by disclosure in another patent application. These two positions are inconsistent—if one is to be over-inclusive and disclose prior art that may not be squarely material, the mere fact of disclosure cannot automatically prove the materiality of a prior art reference.

Schering also argues that the materiality of these reference is reflected in this Court's opinion in 1999 denying Boehringer's motion for preliminary injunction in which this Court stated,

Rather than "teaching away" the use of simian cells, and MA–104 cells in particular, these two references provided a good deal of knowledge to one skilled in the art. Specifically, there is a substantial defense that these articles taught, at the very least, that Vero cells grew the porcine EMC virus and that MA–104 cells might have grown the swine influenza virus. The articles also confirmed the thinking at the time that one (if not two) known viral agents was responsible for the PRRS outbreaks. These articles also affirmed the benefits of simian and MA–104 cells were being used by experts in the field in their independent attempts to isolate the then-unknown porcine virus. The endorsement of MA–104 cells and simian cells, in each of the articles, certainly suggested their relevant in the PRRS inquiry such that there remains a substantial defense of obviousness.

*Boehringer III,* 68 F.Supp.2d at 538. Schering argues that this Court's conclusion that Schering raised a defense of obviousness means that a reasonable examiner surely would have found these reference to be "important" and that these references would have supported a prima facie rejection for obviousness. Schering reads too much into the above-quoted passage.

This Court made clear in *Boehringer III,* that its purpose was not to decide whether the Dea and Van Alstine references rendered the '563 Patent obvious. Rather, it was the Court's purpose to determine whether based upon the record before the Court at that time, Boehringer had borne its burden of proof required to receive a preliminary injunction against Schering. This Court did not conclusively determine the materiality of these references. The existence of a substantial defense does not preclude a later determination that the infringer has not proven by clear and convincing evidence the materiality of the subject references. Rather, after receiving additional evidence during the trials, this Court now weighs all the evidence presented by the parties and the credibility of their witnesses to determine if Schering has satisfied its burden of proof. *See Campaign for Family Farms v. Glickman,* 200 F.3d 1180, 1186 (8th Cir. 2000) (noting that district court's findings of fact and conclusions of law on an application for a preliminary injunction are "tentative and provisional, in the sense

that different findings ... might be warranted after a trial on the merits.") (*citing Independent Fed. of Flight Attendants v. Trans World Airlines, Inc.*, 655 F.2d 155, 159 (8th Cir.1981)); *Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 681 (Fed.Cir.1990) (*citing University of Texas v. Camenisch*, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)) (all findings of fact and conclusions of law at the preliminary injunction stage are subject to change upon the ultimate trial on the merits).

Therefore, after a careful review of the record and weighing the credibility of the witnesses, this Court finds that Schering has failed to prove by clear and convincing evidence that the Dea and Van Alstine references were material to the '778 Patent prosecution.

### 2. Deceptive Intent

Even assuming that Schering proved that the Dea and Van Alstine references were material to the '778 Patent proceedings, the lacking proof of nefarious intent and the evidence that Boehringer acted in good faith, prevents this Court from inferring that Boehringer acted with fraudulent intent.

Schering argues that the necessary level of intent has been established by (a) Mr. Chladek's failure to cause the disclosure of Dea and Van Alstine articles which he had in his possession at some point after attending all of the presentations of the LCI conference and (b) Ms. Devlin's testimony that she reviewed the materials that would have been provided by Mr. Chaldek and others, she presumed she had seen the entire publication but she failed to disclose the Dea and Van Alstine articles to the USPTO. Sch. Br. at pp. 36–37. Schering also argues that this Court· has already concluded that Boehringer should have submitted the entire L.C. I. Booklet to the USPTO such that parsing out several articles but leaving the less-favorable articles behind warrants a finding of inequitable conduct.

To succeed on its defense of inequitable conduct, Schering must prove that Boehringer both knew of the materiality of the contested references and that Boehringer withheld those references with an intent to deceive the USPTO. Thus, the first question is whether there is evidence that Boehringer or its attorneys knew that the Dea and Van Alstine references were material to the '778 Patent application.

This Court can easily dispose of Schering's argument that Boehringer knew that Dea was material based on Dea's hypothesis that a pneumotropic variant of EMC might be the cause of PRRS. There is simply not sufficient·direct or indirect evidence to support this position. Moreover, Schering's own conduct in the prosecution of this case is evidence to the contrary. After years of litigation, the retention of experts to testify in this case and several hearing on the·Dea reference, it was only recently that Schering seriously argued that the Dea reference was material because of the "EMC variant" hypothesis. The length of time it took for Schering to raise this argument thwarts its effort now to charge that Boehringer must have known how material that revelation was years ago when it was prosecuting the '778 Patent.

Therefore, with respect to the Dea reference, Schering is left to argue that Boehringer knew that this reference was material because Dea isolated EMC on Vero and thought that EMC might be responsible for PRRS. With respect to Van Alstine, Schering argues that Boehringer knew that reference was material because it reported the isolation of SIV, a possible cause of PRRS, on an array which included MA–104 cells. Whether Boehringer knew of the materiality of these references, turns on whether Boehringer knew these references would have been important for the examiner to review in connection with the '778 Patent.

There is insufficient evidence that Boehringer or its attorneys knew that either of these two references was material to

the '778 Patent. There is no evidence that the inventors of the '778 Patent studied these references to learn their teachings before the inventors endeavored to isolate PRRS. There is no evidence that Boehringer or its attorneys thought of these references as relevant prior art. *See for example, Elk Corp.,* 168 F.3d 28 (intent to deceive found where inventor and attorney clearly knew of materiality of prior art but did not disclose that prior art to the USP-TO); *Critikon,* 120 F.3d at 1257 (citing patentee's knowledge that prior art was material); *Molins,* 48 F.3d at 1181–82 (inference of intent drawn from patentee's citing the art in a foreign application but not in the U.S. application). Indeed, rather than argue that there is positive evidence of Boehringer's knowledge, Schering argues in the negative that "there is simply no excuse for the failure of Mr. Chaldek and Ms. Devlin (Boehringer's attorney) to provide this relevant document to the Examiner ..." Sch. Br. at 38.[14]

In addition, there is insufficient evidence upon which this Court may infer knowledge of the materiality of these references. Assuming that it was material to the consideration of the '778 Patent that the examiners know that SIV and EMC were considered possible causative agents of PRRS, Schering has not presented this Court with enough evidence, considered against the other evidence presented in this case, to infer that the inventors or Ms. Devlin knew the Dea and Van Alstine references were material to the '778 Patent. Indeed, Mr. Chladek's correspondence with Dr. Collins on October 17, 1990 just days after Mr. Chladek attended the LCI Conference belies any inference that Mr. Chaldek knew that the Dea and Van Alstine references were material to isolating PRRS. In that letter, Mr. Chladek was trying to impress Dr. Collins and reported that Harris had been hitting the virology books to brush up on pneumonia viruses in anticipation of working with Collins's homogenate. Although Schering relies on this letter to show that the homogenate work proved that PRRS was a virus, this letter is interesting for what Mr. Chladek did not tell Dr. Collins. Mr. Chladek did not tell Dr. Collins that he had just attended the LCI Conference where he learned that one of ordinary skill in the art should look at EMC or SIV as possible causative agents

---

**14.** Schering argues that a negative inference should be drawn against Boehringer from its failure to offer Ms. Devlin and/or Mr. Chladek to testify at the bench trial. This Court is surprised by Schering's request for such an inference. In this case, Schering knew in advance that Boehringer did not intend to call these witnesses to testify, yet Schering neither (a) raised this issue at the time of the hearing, (b) requested that these witnesses testify, (c) attempted to subpoena these witnesses for trial testimony (even though Ms. Devlin may have been within 100 miles of this Court), or (d) made a showing that at the time of trial these witnesses were peculiarly in Boehringer's control. Quite to the contrary, Schering offered portions of their depositions in support of its defense of inequitable conduct. By offering their deposition testimony instead of pursuing their live testimony or raising this issue earlier, Schering waived any objections to the admissibility of that testimony and should not now be permitted to benefit from a negative inference be drawn against Boehringer. Indeed, because these witnesses (or at least Ms. Devlin) were available by subpoena but Schering failed to call them to testify,

it is difficult to assume that the prospective testimony would have been wholly adverse to Boehringer and wholly favorable to Schering. *See Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.,* 862 F.Supp. 1361 (E.D.Pa.1994), *aff'd in part, vacated in part,* 63 F.3d 1267 (3d Cir.1995), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1264, 134 L.Ed.2d 212 (1996) (inference drawn from missing witness not appropriate where all parties had access to testimony). Moreover, arguably, because Schering had the burden of proof in this case, any negative inference should be drawn against Schering rather than Boehringer, at least with respect to Ms. Devlin who Schering could have subpoenaed. *Ziggity Systems, Inc. v. Val Watering Systems,* 769 F.Supp. 752, 810 fn. 7 (E.D.Pa.1990).

However, in this case, given the all of the circumstances discussed above, this Court does not draw any negative inference against Boehringer or Schering. This Court notes that even if such a negative inference were drawn against Boehringer, the inference this Court would draw would be slight and would not alter the outcome of this decision.

of PRRS. Nor did he tell Dr. Collins that he just learned that he should try to grow PRRS on simian cells. If, as Schering argues, Mr. Chaldek knew that Dea and Van Alstine were material references, one would have expected Mr. Chaldek to try and impress Dr. Collins with his knowledge of them.[15]

Again, Schering's conduct in this case is very instructive of what this Court can infer Boehringer knew as to the materiality of the Dea and Van Alstine references. The fact that it took Schering until October 1998 to rely upon the Drs. Dea and Van Alstine articles and highlight their significance to the '778 Patent detracts significantly from Schering's inequitable conduct argument. Specifically, although Boehringer first supplied the Drs. Dea and Van Alstine references to the USPTO in the '563 Patent prosecution in June 1992, it was not until 1998 that Schering first claimed that it considered those references to be relevant, material prior art. Therefore, it is difficult for Schering to make a case that Boehringer knew in June 1992 that these two articles were material prior art which was not cumulative of other references.

Against the evidence upon which Schering asks this Court to infer nefarious intent, there is a good deal of evidence demonstrating Boehringer's good faith before the USPO. As detailed throughout this Opinion, Boehringer did not try to keep the existence of the Dea and Van Alstine references from the USPO. Instead, the references cited by Boehringer referred to Dea and Van Alstine's work and the LCI Proceedings. Also, Boehringer's disclosure of the Dea and Van Alstine articles in connection with the '563 Patent belies any deceptive intent. Simply, if Boehringer was truly executing a plan to keep Dea and Van Alstine's work from the examiners, Boehringer would have also kept all of the other references from the examiners because those articles referred directly to Dea and/or Van Alstine's work. Boehringer also would not have disclosed these references to the USPO in connection with the '563 Patent prosecution.[16] Thus, the fact that Boehringer disclosed other references to the examiners considering the '778 Patent and Boehringer's disclosure of the Dea and Van Alstine references in the '563 Patent prosecution undermine Schering's offer of intent to deceive and rebuts Schering's proof with proof of good faith.

### 3. Balancing

Since Schering failed to prove the materiality of either the Dea or Van Alstine reference and likewise failed to prove that Boehringer intended to deceive the USPO, this Court need not balance materiality and the intent to determine if the level of

---

**15.** Moreover, if Mr. Chaldek were aware that the Dea and Van Alstine references were material, one would also have expected him to share these references with Dr. Harris and keep a copy of them in his files. There is no evidence that Mr. Chladek did either.

**16.** Schering also relies upon this Court's statement in the *Boehringer III* that "it was appropriate for Boehringer to submit the entire booklet, rather than just the Drs. Dea and VanAlstine articles, to the USPTO because the booklet is very instructive of the state of the art in 1990." *Boehringer III*, 68 F.Supp.2d at 546. This statement in the context of the preliminary injunction hearing in the '563 Patent case, however, does not preclude this Court's current finding that Schering has not proven the materiality of the Dea and Van Alstine references or Boehringer's intent to withhold them. The statement from *Boehringer III* merely reflected this Court's opinion that it was appropriate, if Boehringer chose, not to separate out or highlight specific articles from the LCI Proceedings booklet.

The Court notes that Schering's arguments in this case and the related '563 action leave the Court with the impression that Schering believes, in hindsight, that there was only one way in which Boehringer could have properly disclosed the Dea and Van Alstine references, *i.e.*, by disclosing them with the LCI booklet *and* highlighting their relevance to the USPO. This is a troubling position for Schering to take given the high burden of proof necessary for a defense of inequitable conduct and the grave consequences to a patent holder if the defense is successful.

culpability warrants the invalidation of the '778 Patent. However, even if this Court found that those references were somewhat material to the USPO's consideration of the '778 Patent, the paucity of evidence supporting even an inference of deceptive intent in light of the evidence of good faith in this case, would prevent this Court from finding that Boehringer's conduct was so culpable as to warrant the invalidation of the entire '778 Patent.[17]

## II. CONCLUSION

In conclusion, after considering all of the evidence submitted by the parties in this case, this Court rejects Schering's defense of inequitable conduct.

---

**17.** This Court adds that even considering together Schering evidence of materiality and intent with respect to each of the contested references, this Court does not find that the references together would be material or that Boehringer's conduct in this case reveals a pattern of deceptive conduct.